# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH DUANE ARLINE, JR., | CASE NO. 1:07-cv-01097-LJO-GBC (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATION RECOMMENDING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| KEN CLARK, | (ECF No. 70) |
| Defendant. | |
| / | OBJECTIONS DUE WITHIN THIRTY DAYS |

**FINDINGS AND RECOMMENDATION**

I. **INTRODUCTION**

Plaintiff Keith Duane Arline, Jr., ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. This action proceeds on Plaintiff's Complaint in which he alleges that Defendant Clark violated the Eighth Amendment by denying Plaintiff outdoor exercise during modified programming at the facility where he was being held. (ECF Nos. 1 & 12.)

On May 6, 2011, Defendant Clark filed a Motion for Summary Judgment, arguing:

1

(1) Plaintiff's Eighth Amendment cruel and unusual punishment argument fails because he failed to prove the necessary elements; and (2) Defendant Clark is entitled to qualified immunity. (ECF No. 70.) Plaintiff filed an opposition on June 27, 2011 and Defendant replied on June 29, 2011.[1] (ECF Nos. 82 & 85.)

## II.  SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). While the Court may consider other materials in the record not cited to by the parties, it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

As the moving party, Defendant bears the initial burden of proving the absence of a genuine dispute of material fact. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (quotation marks omitted). Because Plaintiff bears the burden of proof at trial, Defendant need only

---

[1] Plaintiff filed three surreplies which were stricken pursuant to Local Rule 230(l). (ECF Nos. 86, 87, 88, & 90.)

2

prove that there is an absence of evidence to support Plaintiff's case. In re Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 326) (quotation marks omitted).  If Defendant meets his initial burden, the burden shifts to Plaintiff to designate specific facts demonstrating the existence of genuine issues for trial. Id. (citing Celotex, 477 U.S. at 324).

In resolving Defendant's motion for summary judgment, all of the evidence must be viewed in the light most favorable to Plaintiff as the non-moving party, Garcia v. County of Merced, 639 F.3d 1206, 1208 (9th Cir. 2011); Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011), all reasonable inferences must be drawn in his favor, LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1136 (9th Cir. 2009); Pinard v. Clatskanie School Dist. 6J, 467 F.3d 755, 763 (9th Cir. 2006), and his response is treated more indulgently because he is the nonmoving party, Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985).

However, Plaintiff must support his opposition with admissible evidence.  Verified pleadings and verified oppositions constitute opposing declarations so long as they are based on personal knowledge and they set forth facts admissible in evidence to which the declarant is competent to testify, Moran v. Selig, 447 F.3d 748, 759-60 (9th Cir. 2006); Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Lopez v. Smith, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); Schroeder v. McDonald, 55 F.3d 454, 460 n. 11 (9th Cir. 1995); McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam); Lew, 754 F.2d at 1423, with personal knowledge and competence to testify inferable from the declarations themselves, Barthelemy v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990) (per curiam) (quotation marks omitted); also Sea–Land Service, Inc. v. Lozen Intern., LLC, 285 F.3d

808, 819 (9th Cir. 2002). Arguments or contentions set forth in an unverified responding brief, on the other hand, do not constitute evidence. See Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d 758, 762 (9th Cir. 1987) (recitation of unsworn facts not evidence). Plaintiff's amended complaint is verified and he submitted a declaration and documentary evidence in support of his opposition.

### III.   FACTS [2]

#### A.   General Facts

Defendant Clark was the warden at Corcoran Substance Abuse and Treatment Facility ("CSATF") during 2006. (ECF No. 70-4, Clark Decl., p. 1.) During 2006, Defendant approved the modified programming that included restrictions on outdoor exercise affecting various facilities and populations of inmates at CSATF. (Id. at 1, 3-4.) The modified programs resulted from threats to institutional safety and security, and they enabled staff to conduct investigations into actual incidents of violence, contraband, and planned assaults discovered by correctional staff.[3] (Id. at 5-6; ECF No. 70-3, Diaz Decl., pp. 7-8.)

The modified programs implemented in 2006 were each tailored to specific facilities, specific buildings within facilities, and, in some instances, specific populations depending on the circumstances that triggered the modified programming. (Diaz Decl. at 7-8.) A modified program typically involves the suspension of various programs or services for a specific group of inmates and/or in a specific part of a facility. (Id. at 2.) Work and education programs may be suspended; telephone, canteen, or visiting privileges may be

---

[2] Facts are undisputed unless otherwise noted.

[3] Plaintiff disputes whether the threat was serious; however, as discussed below, he does not have personal knowledge of the threat level and all investigatory information to make that conclusion.

4

restricted; and religious programming may be restricted. (Id.) Programs and privileges are restored incrementally, consistent with institutional safety and security concerns. (Id. at 4-5.)

Generally modified programming is imposed after serious threats to institutional security and the safety of inmates and staff, and in a prison setting, it is necessary when correctional officers discover evidence or receive information that violence or disruptions are being planned by some inmates against other inmates or staff. (Clark Decl. at 3.) California Department of Corrections and Rehabilitation ("CDCR") policies and procedures direct that when a serious incident occurs, the priorities are: (1) isolate, contain, and control the situation to the smallest possible area; (2) provide medical attention to all injured persons; (3) preserve all available evidence; (4) identify all involved persons; and (5) complete and submit appropriate written documentation and reports within the designated time frames. (Diaz Decl. at 2.) After the initial incident response is completed, the incident is assessed and programming is determined. (Id. at 2-3.) If the incident is serious, it may be necessary to modify or restrict program activities for some or all of the inmates by: (1) declaring a State of Emergency; (2) locking down an entire facility or portions of a facility; or (3) placing some or all of the facility on a modified program. (Id. at 3.)

During modified program, the safety and security concerns of the inmates and staff, and the duty to investigate and to determine the causes of the disturbances or acts of violence, compel prison officials to enforce restrictions within the facility, which may include but are not limited to suspension of outdoor exercise, canteen, telephone, and regular visits. (Id. at 2.)

Once modified programming is declared, the process of investigating and gathering intelligence begins. (Id. at 3.) The facility is searched, including the yards, cells, common areas, and other areas, for evidence, weapons, and contraband. (Id.) Facility staff and inmates are interviewed to gather intelligence about the incident and to determine whether it is safe to return to normal programming. (Id.) During the investigation, staff communicate regularly with other institutions and CDCR headquarters to determine whether it is safe to return to normal programming. (Id. at 4.) Other institutions may also interview their inmates and monitor inmate communications for related intelligence. (Id.)

CDCR's policy is to return to normal programming when it is safe to do so. (Id.) Gathering information about the cause of violence that has occurred or the plans for committing acts of violence is imperative so that prison staff can determine how and when to resume normal programming and avoid further incidents. (Id.) As a result, modified programming is generally changed in stages. (Id. at 5.) An incremental unlock plan is developed to return to full programming. (Id.) The resumption of normal program activities occurs when the majority of regularly scheduled staff members are present. (Id.) Inmates are released, and privileges restored, incrementally. (Id.) Small groups of inmates may be released so staff can observe their conduct in a controlled environment and evaluate whether the planned unlock can proceed safely. (Id.) If another incident occurs during the unlock process, previously released inmates may be locked down again so an investigation of the new incident can be completed. (Id.) If it is determined that returning to regular programming would pose too great a risk, the modified program may be continued. (Id.)

During a modified program, there are weekly mandatory meetings with the Warden or Chief Deputy Warden, the Facility Captain, the Associate Warden, the Use of Force

6

Coordinator, and any line staff member with relevant information. (Id. at 4.) The attendees discuss the progress of the investigation, the status of the programming, and the development of a plan to resume normal programming. (Id.) The Associate Director of Institutions is apprised of the status via weekly reports and bi-weekly conference calls. (Id.)

Of all the normal programming activities suspended during modified programming, it is most difficult to determine when outdoor exercise programs can safely be resumed. (Id. at 6.) Because inmates have the greatest access to each other on the exercise yards, that is typically where most inmate-on-inmate assaults occur. (Id.)

In determining when and how to safely resume outdoor exercise programs after a lockdown/modified program, Defendant had to consider numerous factors, including that during normal programming, the number of inmates on a yard greatly outnumbered prison staff assigned to monitor them and the self-imposed ethnic divisions that could be linked to the incident that caused the change in programming, or which could trigger further violence, were especially pronounced on the exercise yards due to various ethnic groups claiming areas of the yard as their turf. (Id. at 6.) These factors affected decisions on the timing and scope of resuming outdoor exercise so as to best ensure the safety of correctional officers and inmates. (Id.)

B.  2006 Modified Programs

On August 15, 2006, a modified program, including restrictions on outdoor exercise, was implemented due to an incident inside the prison. (Clark Decl. at 6.) Prison staff received a note indicating that specific inmates were in possession of significant contraband, including weapons, cell phones, and controlled substances. (Diaz Decl. at 7.) A search was immediately commenced and produced two buck knives, an inmate-

manufactured weapon, a video recorder, a cell phone, heroin, marijuana, and United States currency. (Id. at 8.) The presence of the recording equipment and knives was very unusual and indicated that a larger plan might be involved. (Id.) It was also suspected that there was staff member involvement. (Id.) Because of the nature of the contraband and the suspicion of staff involvement, a thorough security evaluation was necessary. (Id.) Every area of the facility was searched, including exercise yards, day rooms, storage areas, staff offices, staff restrooms, all classrooms, library, clothing room, canteen room, medical clinic, and supervisor's offices. (Id. at 9.) Searches were conducted of all inmates, their cells, mattresses, and property. (Id.) At the conclusion of the investigation, restrictions began being lifted, eventually returning to normal programming on October 10, 2006. (Id. at 10; ECF No. 70-2, Motion for Summary Judgment Undisputed Facts ("UDF"), p. 10.)

On October 20, 2006, a modified program, restricting outdoor exercise, was again instituted because of an attack on staff. (Diaz Decl. at 11.) An investigation began to determine if it was an isolated incident or part of a larger plan. (Id.) Days into the investigation, one inmate killed another inmate so the modified programming was expanded. (Id.) Again, searches were conducted and as the investigation progressed, restrictions were eased. (Id. at 12.) This modified programming lasted until November 27, 2006. (UDF, p. 12; Clark Decl. at 6.)

Between the two modified programming times, Plaintiff was not allowed outdoor exercise for a total of ninety-six days.

During the initial modified programming, Plaintiff filed a grievance regarding the lack of outdoor exercise, which was denied. (ECF No. 83, Pl.'s Decl., p. 1.) Plaintiff contends

8

that it was denied because the facility was understaffed. (ECF No. 82, Pl.'s Opp., pp. 9 & 16.) Defendant argues that the denial only states that staffing levels did not permit use of the yards. (ECF No. 70, Motion for Summary Judgment, p. 5.)

The investigations into the incidents triggering the modified programming were time consuming and labor intensive, and included interviewing inmates multiple times, searching yards, cells, common areas for evidence, weapons, and contraband, screening mail, examining all evidence and information obtained, and sharing information. (See generally, Clark Decl. & Diaz Decl.)

Defendant met regularly with other CDCR officials to evaluate information gathered, reevaluate all modified program conditions, and discuss the status of the programming, as well as consider return to normal operations as quickly and safely as possible. (Clark Decl. at 2.) Without a thorough investigation into the conduct that triggered each implementation of modified programming, Defendant would not have been able to make decisions to accommodate coming off of modified programming in a way that would minimize further eruptions of violence during the unlock process. (Id. at 5.)

When investigations yielded some certainty that further violence would not ensue, Defendant implemented a gradual and incremental return to normal programming with the eventual return to normal programming. (Id. at 6-7.) This enabled Defendant to monitor and assess whether the phased unlock could safely continue. For each modified program, Defendant believed that the restrictions imposed, including the restriction on outdoor exercise, would be effective in stopping the violence and in helping to restore order. (Id. at 6.)

//

## IV. ANALYSIS

### A. The Eighth Amendment Claim

#### 1. Legal Standard

"[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'" Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). The Eighth Amendment, which protects prisoners from inhumane conditions of confinement, Farmer v. Brennan, 511 U.S. 825, 833 (1994), is violated when prison officials act with deliberate indifference to a substantial risk of harm to an inmate's health or safety, e.g., Farmer, 511 U.S. at 828; Thomas v. Ponder, 611 F.3d 1144, 1151–52 (9th Cir. 2010); Richardson v. Runnels, 594 F.3d 666, 672 (9th Cir. 2010).

Two requirements must be met to show an Eighth Amendment violation. Farmer, 511 U.S. at 834. First, the deprivation must be, objectively, sufficiently serious. Id. (quotation marks and citation omitted). The objective component is contextual and responsive to contemporary standards of decency. Hudson v. McMillian, 503 U.S. 1, 8 (1992) (quotations marks and citation omitted). Extreme deprivations are required to make out an Eighth Amendment conditions-of-confinement claim. Hudson, 503 U.S. at 9 (quotation marks and citation omitted). Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Id. (quotation marks and citations omitted).

Second, prison officials must have a sufficiently culpable state of mind, which for

conditions-of-confinement claims is one of deliberate indifference. Farmer, 511 U.S. at 834 (quotation marks omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837 (quotation marks omitted). Thus, prison officials may be held liable under the Eighth Amendment for denying humane conditions of confinement only if they know that inmates face a substantial risk of harm and they disregard that risk by failing to take reasonable measures to abate it. Id. at 847 (quotation marks omitted).

Inmates have a constitutional right to exercise and the denial of out-of-cell exercise for an extended period of time is sufficiently serious to state a claim under the Eighth Amendment. Thomas, 611 F.3d at 1151–52. There is no bright line in terms of how many hours of out-of-cell exercise per week satisfy the Constitution. Noble v. Adams, 646 F.3d 1138, 1141 (9th Cir. 2011) (no outdoor exercise or other privileges for approximately fifteen months); Hebbe v. Pliler, 627 F.3d 338, 343-44 (9th Cir. 2010) (inmate permitted out of his cell for only eight hours a week and impermissibly required to choose between exercise and law library access during those hours); Thomas, 611 F.3d at 1151-52 (no out-of-cell exercise for thirteen months); Pierce v. County of Orange, 526 F.3d 1190, 1211-13 (9th Cir. 2008) (at least two days a week for at least two hours total per week sufficient exercise); LeMaire, 12 F.3d at 1457–58 (no out-of-cell exercise for most of a five-year period); Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994) (in-cell confinement for almost twenty-four hours a day and forty-five minutes of outside exercise per week for a six-week period); Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (fewer than five hours of exercise per week and no outdoor exercise for some inmates over a period of years). Short-term, temporary deprivations of exercise without medical effects are not sufficiently serious to

11

support an Eighth Amendment claim, Thomas, 611 F.3d at 1155; Norwood v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2010); May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997); Allen, 48 F.3d at 1088, but the deprivation of exercise for a period of six weeks can support a claim, Allen, 48 F.3d at 1088.

      2.      Discussion

Defendant argues that Plaintiff's Eighth Amendment cruel and unusual punishment argument fails because Plaintiff failed to prove the necessary elements. Specifically, Defendant contends that Plaintiff has failed to prove the subjective requirement, i. e., that Defendant had a sufficiently culpable state of mind. Defendant declares that, in the interest of safety and security of the prison, including staff and inmates, modified programs were instituted after the two serious incidents: the finding of highly unusual contraband leading to the suspicion of staff member involvement and an attack on staff. Defendant further declares that he reasonably believed modified programming to be necessary for institutional safety and security as well as to investigate the incidents. Defendant claims that the modified programming was temporary in nature, that he relied on credible evidence that the restrictions were necessary to secure safety and security, that the scope of the modified programs were limited, and that the modified programming was lifted as soon as he believed it was safe to resume normal programming. Defendant Clark claims that these restrictions and modified programming were completely reasonable given the circumstances.

Plaintiff appears to dispute two things: (1) the seriousness of the threat to the safety and security of the institution and, thus, the reasonableness of Defendant's response; and (2) the feasibility of using the concrete yards for outdoor exercise during modified

programming.

Defendant contends that Plaintiff has no personal knowledge as to the details of the threats to the institution and thus, cannot contest credibility of the threat, nor can Plaintiff aver that the restrictions on outdoor exercise were unnecessary or unreasonable. Defendant also contends that Plaintiff's request for use of the concrete yards as an alternative was not feasible. Specifically, Defendant states that implementing that alternative would have hindered the ongoing investigation, required additional staff who were otherwise occupied, and implicated additional safety concerns. Defendant also highlights the fact that Plaintiff does not dispute that the modified programs were lifted as soon as practically possible or that providing access to the concrete yard would have raised additional security concerns.

Defendant has submitted admissible evidence demonstrating that the modified programming was necessary in both instances and that the concrete yards were not a feasible alternative. (See Clark Decl., p. 7 & Diaz Decl., pp. 13-14.) Because Defendant has presented affirmative evidence negating an essential element of Plaintiff's claim, Plaintiff, as the nonmoving party, "must do more than simply deny the veracity of everything offered." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Plaintiff fails to do this. Plaintiff has offered nothing more than his bare, lay opinion on these issues.[4] Plaintiff has failed to offer evidence disputing the

---

[4] Plaintiff has no expertise in prison management and he may not offer as evidence his own opinion on matters which require scientific, technical, or other specialized knowledge. Fed.R.Evid. 701, 702. Plaintiff is limited to testifying on admissible matters to which he has personal knowledge and the competency to testify.

reasonableness of Defendant's response, the severity of threat to the institution, or the feasibility of the proposed alternative.

Plaintiff has provided no evidence raising a genuine dispute as to any material fact regarding the necessity, or reasonableness, of the modified programming in light of the contraband and incidents in the prison. Both events necessitated investigations and determinations that the modified programming could be lifted and normal programming could safely resume. There is no evidence that Defendant acted with deliberate indifference in approving the ninety-six day modified programming. In fact, the opposite appears to be true. His decisions were calculated and thoughtful and based on the evidence presented to him by his staff. Plaintiff also failed to provide any evidence that using the concrete yards was a feasible alternative. The Court declines to second-guess these decisions or to determine that the length of the modified programming exceeded what was reasonably necessary to conclude the investigations and resume normal programming. Norwood, 591 F.3d at 1069–70.

Defendant Clark is entitled to judgment as a matter of law on Plaintiff's claim arising from the denial of outdoor exercise resulting from the August 15/October 10, 2006 modified programming.

B.   **Qualified Immunity**

Defendant also argues that he is entitled to qualified immunity. For the reasons previously set forth, the Court finds that Defendant is entitled to judgment as a matter of law on Plaintiff's claims against him. Alternatively, Defendant is also entitled to qualified immunity.

//

1. Legal Standard

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving a claim of qualified immunity, courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Delia v. City of Rialto, 621 F.3d 1069, 1074 (9th Cir. 2010); Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009). While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Delia, 621 F.3d at 1074-75; Mueller, 576 F.3d at 993-94.

2. Discussion

Even as of 2011, it has not been clearly established how or when prison officials must lift a lockdown or modified program implemented in response to threats to the safety and security of the institution arising from riots or information that inmates plan to assault

15

staff and introduce narcotics and contraband into the prison. Noble, 646 F.3d at 1143; Norwood, 591 F.3d at 1070. In light of the undisputed evidence regarding the reasons for the modified programs, the investigatory steps that must be undertaken in responding to the events, and the need to lift the modified programs in stages depending upon the results of the investigations, it would not have been clear to a reasonable officer that restricting an inmate's outdoor exercise in conjunction with the modified programs at issue here was unlawful. Defendant Clark is, therefore, entitled to qualified immunity.

## V.  CONCLUSION AND RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that Defendant's Motion for Summary Judgment, filed May 6, 2011, be GRANTED. As that is the only claim proceeding in this action, the Court further RECOMMENDS that JUDGMENT be entered in favor of Defendant Clark and the CASE be DISMISSED.

These Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these Findings and Recommendation, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   September 22, 2011                                   UNITED STATES MAGISTRATE JUDGE